IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES of AMERICA                                           PLAINTIFF

V.                    NO. 2:08-CR-20031-JLH

ANDREW PHILLIP NICHOLS                                              DEFENDANT

## REPORT AND RECOMMENDATION

Before the court is a Motion to Suppress (Doc. 16) filed by the Defendant on July 2, 2008. The Motion was referred to the court for a Report and Recommendation by Order (Doc. 20) dated July 2, 2008. The Government filed a Response (Doc. 32 ) on July 9, 2008.

**Background:**

An evidentiary hearing on the Motion to Suppress was held on July 10, 2008. Testifying at the hearing was Michelle Lamb, Officer Stephen Tate with the Alma police department, Detective Brett Hartley with the Alma police department and Kevin Richmond with the Arkansas State Police.

Michelle Lamb testified that she was the live-in girlfriend of the Defendant. She stated she had been seeing the Defendant for approximately two years. She found out she was pregnant with the Defendant's child (Tr. 9) in November of 2006 and they began to live together. The baby was born July 18, 2007. (Tr. 11) Before the baby was born the Defendant and Ms. Lamb began to look for a larger house. They located the property at 1414 Kingwood Street, Alma, Arkansas. The Defendant purchased the above property and the Defendant, Ms. Lamb and her 8 year old daughter moved into the property in May 2007. (Tr. 10) Ms. Lamb's name was not on the deed and she did not pay any rent to Mr. Nichols. Ms. Lamb, however, did pay the electric and water bills and some of the repair bills on the home. She also purchased the groceries and prepared the meals at the home. (Tr. 11-12) It was her only residence and she received her mail at that location. Ms. Lamb stated that

she had complete free access to the home. (Tr. 13) After Mr. Nichols' son was born Ms. Lamb came back to that residence to live.

On August 15, 2007, Ms. Lamb stated that she discovered an unlabed cd disk which was in the packet containing a game disk. When she placed the unlabed disk into the computer she discovered it had adult pornography on the disk. She looked into another game packet and discovered another unlabled disk which she inserted into the computer. This disk contained sexually explicit photographs of her 8 year old daughter which appeared to have been taken while her daughter was asleep. Ms. Lamb stated that she and Mr. Nichols had joint access to the computer. She had her own computer, but they did not use her computer and it had been placed in a closet in the home. Ms. Lamb testified that Mr. Nichols was the owner of the computer that she gave to Officer Tate. (Tr. 18-19)

Ms. Lamb immediately called the Alma police department and notified them about what she had found. Stephen Tate, with the Alma police department responded to the call.

Stephen Tate testified that he was a police officer with the city of Alma and that he responded to Ms. Lamb's call. Ms. Lamb met him at the door and invited him into the house. She explained to him what she had found on the disks (Government's Exhibit 1) and handed him the two disks. He stated that Ms. Lamb was very emotional and upset over the pictures she had found of her then seven year old daughter. The officer contacted Sergeant Hartley and when he arrived both he and Hartley witnessed the pictures. The prosecuting attorney was contacted and authorized a probable cause arrest of the Defendant. Ms. Lamb wanted the officers to take the two disks and the computer and she gave the items to the officer.

Officer Tate did not recall Ms. Lamb telling him that she did not own the home. (Tr. 50)

2

It was his understanding that Ms. Lamb resided there. Ms. Lamb stated to Officer Tate that she lived there with her boyfriend, that was where her belongings were and she had lived there since May 2007. (Tr. 54)

Officer Tate arrested the Defendant around 5:00 p.m. (Tr. 32)

Officer Tate completed a probable cause affidavit (Exhibit 2) (Tr. 36)

Officer Tate witnessed Detective Hartley read the Miranda rights to the Defendant. (Tr. 37-38) (Government's Exhibit 3). The Defendant did give a statement (Government's Exhibit 4) and Officer Tate watched him write the statement. (Tr. 39) The Defendant completed his statement at 6:35 p.m. and he had been arrested around 5:15 p.m. (Tr. 40) It was about a 10 minute drive from the place of arrest to the police station. Officer Tate denied that he threatened, bribed or made any offers of leniency to the Defendant to get him to make a statement. He also stated that his demeanor was calm while he wrote the statement. (Tr. 41) Officer Tate testified that it took Defendant a long time to write out his statement. (Tr. 42) Officer Tate denied that anyone told the Defendant what to put in the statement or that anyone had threatened him. (Tr. 43)

Officer Tate testified that the "x" to the left of number three on the rights form meant that the Defendant read that paragraph out loud. Officer Tate believed that the Defendant did understand his rights. (Tr. 45-46)

Officer Tate stated that he never moved his chair close to the Defendant, never yelled at the Defendant, slammed his fist on the desk or denied any request that the Defendant made of him. (Tr. 71-72).

Detective Hartley testified that after he got the call from Officer Tate he responded to the home and spoke with Ms. Lamb. (Tr. 74) He then called the prosecuting attorney's office to make

3

a report and ask for guidance. The prosecutor's office suggested that he view the pictures to determine probable cause. (Tr. 75) Detective Harley requested that Ms. Lamb insert the disk into the computer so that he could view the pictures which Ms. Lamb did. After viewing the pictures Detective Hartley, in conjunction with the prosecuting attorney's office, determined that probable cause existed to arrest Mr. Nichols. (Tr. 76-77)

Detective Hartley left the home and heard Officer Tate arrested the Defendant a short time later. He returned to the police station to assist in the questioning of the Defendant. (Tr. 81) Detective Hartley testified that he first had the Defendant complete a general information form. This form did not ask anything about the crime but solicited name, address and work information. (Tr. 85) Detective Hartley then read the Defendant his Miranda rights. (Exhibit 3) (Tr. 89-90) The Defendant acknowledged that he understood each right. Detective Hartley stated that he wrote the word "yes" beside each right after he read the statement and the Defendant responded that he understood. The Defendant placed his initials beside the word "yes" on each of the rights.

Detective Hartley stated that he had the Defendant read out loud right number 3. He placed the "x" by the right and had the Defendant initial in the margin. He stated that he does this to make sure the defendant can read. The Defendant made no request for a lawyer or to use the phone. (Tr. 91)

When the Defendant got to the waiver of rights portion of the form the Defendant stated "I'm not sure what is going on." At that point Detective Hartley admits that he became irritated and spoke "harshly" to the Defendant. (Tr. 91-92) Detective Hartley denied that he threatened any force or pushed the Defendant into doing something. (Tr. 93)

Detective Hartley testified that "I wasn't very friendly, sir, if you want to know the truth. I

4

mean, when he came to the point of that in that Waiver of Rights Form, I believe myself or any other human being is probably not going to be a happy person to deal with." (Tr. 100)

Detective Hartley testified that his manner was gruff but denied that it was threatening (Tr. 102) or that he was being physically rough with the Defendant. (Tr. 103) Detective Hartley stated that it was the Defendant's attitude of poor-innocent-me that got him irritated and that, when the Defendant stated he did not understand what was going on, Detective Hartley explained to him again why they were there, why they were called to the house (Tr. 116) and why he was arrested. (Tr. 118)

Detective Hartley denied that he made any promise to the Defendant but did stress to him that it was important to be honest. (Tr. 119-120) Detective Hartley admits that he may have used obscenities toward the Defendant but does not remember what they were. (Tr.121)

Detective Hartley stated that if at any time the Defendant had requested a lawyer the interview would have stopped. (Tr. 97) Mr. Nichols did sign the waiver of rights portion of the form and agreed to give a statement. (Tr. 99)

Detective Hartley testified that he believed Ms. Lamb resided in the home (Tr. 112) and had joint access to the computer. (Tr. 113) Ms. Lamb's children were in the home. (Tr. 114)

Kevin Richmond testified that he assisted the Crawford County Prosecutor's office by preparing an affidavit (Government's Exhibit 6-7) which was used to obtain a search warrant for the computer which Ms. Lamb gave to Officer Tate. (Government's Exhibit 8) Prior to executing the affidavit Officer Richmond had no idea if the computer had been hooked up to the internet. (Tr. 126)

The record was left open for 10 days. On July 29, 2008, the Defendant requested to reopen the record and a supplemental hearing was held on August 22, 2008. Testifying at the hearing was Cindy Nichols and Andrew Phillip Nichols, the Defendant.

5

At the supplemental hearing, the Defendant's mother, Cindy Nichols, testified that the Defendant called her at around 8:15 p.m.on August 15, 2007. She stated that he was terrified and his voice was cracking. The Defendant reportedly told her that he had been arrested, taken to the police station, and questioned.

According to Ms. Nichols, the Defendant was denied his request for counsel, denied access to a phone, and was told that he would not lawyer up and would do what he was told. However, in spite of her belief that the Defendant was coerced into giving a statement, she did not testify or even appear for the Defendant's suppression hearing in state court on January 7, 2008. Ms. Nichols said that Mr. Cook advised her that he had it handled. She also indicated that she did not file a complaint with Alma police department.

The Defendant also testified at the supplemental hearing. He stated that Officer Tate followed him home on the afternoon of August 15, 2007. When he pulled into his driveway, Officer Tate pulled his weapon and advised him that he was under arrest. The Defendant was then taken to the police department for questioning.

The Defendant described the room as a 10x12 windowless room with a desk, 2 chairs, and a table. Officer Tate reportedly sat behind the desk, while Detective Hartley sat closer to the Defendant. After completing a general information form, the Defendant was handed the Miranda form. He testified that he stopped on the line advising him of his right to an attorney and requested counsel. At this point, the Defendant stated that Detective Hartley pounded his fist on the desk, pointed his finger at him, and said "you won't lawyer up, you will do as you are told."

As the Defendant continued filling out the form, he said he told the officers that he did not intend to waive his rights. However, the Defendant testified that the officers reassured him that this

6

was protocol and that he was not waiving any of his rights. Once the Miranda form was complete, they placed a sheet of paper in front of the Defendant and Detective Hartley reportedly advised the Defendant that they had 2 disks. The Defendant testified Detective Hartley then told him that the jury would look more favorable on him if he confessed.

After telling the Defendant that they had all night and that he wasn't going anywhere, Detective Hartley left the room. Defendant testified Officer Tate then reportedly told the Defendant the address at which the crimes allegedly occurred, provided him with a time frame, and gave him several choices as to the motive for the crime. The Defendant stated that he chose to say that he was curious.

According to the Defendant, it took him a while to write out his statement. At one point, he reportedly, stopped, pushed the paper away, and said that he needed help, an advisor or a counselor. Officer Tate then looked at the Defendant's confession, told him he was almost finished, and assured him he could seek help once his statement was complete. The Defendant stated Officer Tate also told him to make sure that he mentioned something about the child's genitalia being photographed. The Defendant then finished his statement, after which he was placed into the patrol car, given back his cell phone, and then escorted to jail.

**Discussion:**

### A: Entry into the home

The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). The prohibition does not apply, however, to situations in which voluntary consent has been

obtained from a third party who possesses common authority over the premises. See *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained. *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *Georgia v. Randolph,* 547 U.S. 103, 106, 126 S.Ct. 1515, 1518 - 1519 (U.S.Ga.,2006)

As was stated in Matlock, supra, at 171, n. 7, 94 S.Ct., at 993, n. 7, "[c]ommon authority" rests "on mutual use of the property by persons generally having joint access or control for most purposes...." The burden of establishing that common authority rests upon the Government.

In this instance the Government has clearly established the common authority Ms. Lamb had in the property. Ownership has never been the determining factor. Ms. Lamb and the Defendant were boyfriend and girlfriend. She became pregnant with his child and they began to look for a place to live together and moved into the residence in Alma with her seven year old daughter. She had no other residence. All of her property was at the location. After the baby was born she came back to the residence jointly shared with the Defendant. She paid the utility bills, did the grocery shopping and prepared the meal at the residence. It is obvious that she had complete mutual use of the property. The Defendant's objection to the entry into the home is without merit.

### B: Defendant's Statement

The Defendant contends his statement was involuntarily made-the result of threats and coercion-and therefore should be suppressed, despite the Miranda warnings. A defendant's statements after being advised of his Miranda rights may be used against him if he knowingly and

8

voluntarily waived his rights. *Missouri v. Seibert*, 542 U.S. 600, 608 n. 1, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004)). "A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right, and a waiver is 'voluntary' where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception." *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2005). The totality of the circumstances inform whether a "defendant's will was overborne," making his statement involuntary. *United States v. Annis*, 446 F.3d 852, 855 (8th Cir. 2006); *U.S. v. Bell,* 477 F.3d 607, 612 (C.A.8 (Ark.),2007).

There can be no doubt that the Defendant was intelligent and understood the rights that were explained to him. Both officers testified that the Defendant seemed very intelligent and that he appeared to understand what was read to him. The Defendant demonstrated his ability to read when he read one of the rights out loud for the officers. Further, at the supplemental suppression hearing on August 22, 2008, the Defendant testified that he had a high school education with some college course credits. The Defendant stated that, at the time of his arrest, he was employed as a financial advisor. In such capacity, the Defendant acted as a fiduciary, selling insurance and brokering bonds, mutual funds, and IRA's. As such, it is clear to the court that the Defendant intelligently waived his rights. There was no evidence that the Defendant was impaired in any way at the time of the interrogation.

The issue is whether the waiver of rights was voluntary. It is undisputed that when the Defendant got to the waiver of rights portion of the Miranda warnings he made the statement that "you know, that's just it for me right now. I'm really not sure what's going on and I'm not sure what I'm doing." (Tr. 92) Detective Hartley testified that at that point he did speak "harshly" to the

9

Defendant. (Tr. 91) Detective Hartley testified that his manner was gruff but denied that it was threatening (Tr. 102) or that he was being physically rough with the Defendant. (Tr. 103) He denied that he struck the desk or moved close to the Defendant or denied him the use of the restroom, food or water but admitted that he may have cursed at him. (Tr. 121) Detective Hartley also urged the Defendant to be "honest" and that a jury would be "more apt to help that person." (Tr. 119-120)

The due process test takes into consideration "the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation." [*Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)] See also *Haynes v. Washington*, 373 U.S. 503, 513] (1963); *Gallegos v. Colorado*, [370 U.S. 49, 55] (1962); *Reck v. Pate*, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); *Malinski v. New York*, [324 U.S. 401, 404] (1945)("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant"). The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Stein v. New York*, [346 U.S. 156, 185] (1953).

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a Miranda warning has been given, see, *Withrow v. Williams*, 507 U.S. 680, 693 (1993); any elements of "police coercion," see, *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); the length of the interrogation, see, *Ashcraft v. Tennessee*, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, *Reck v. Pate*, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, *Leyra v. Denno*, 347 U.S. 556, 561 (1954). See also, *Withrow v.. Williams*, supra at 693 (listing the applicable considerations).

In this case the Miranda Warnings were given to the Defendant. They were read to him and he acknowledged each right by placing his initial beside the right indicating that he understood. In addition he read one of the rights out loud to the police officers.

At the supplemental hearing, Defendant asserted that he requested the assistance of counsel and was denied this request. Defendant's mother also testified that Defendant reported that he was denied his request for counsel. Because the Government and the defense witnesses presented conflicting accounts of the conditions under which Defendant provided his statements, credibility is the determining factor for this court. *U.S. v. Bell*, 477 F.3d 607, 612 (8th Cir. 2007). Due to the facts and circumstances in this case, including Defendant's failure to assert his denial of counsel at any time prior to the supplemental suppression hearing on August 22, 2008, this court finds Officer Tate's and Detective Hartley's testimony that Defendant never requested counsel to be more credible.

With regard to elements of police coercion, testimony reveals Detective Hartley spoke harshly to the Defendant. This is the Detective's characterization of his demeanor. The detective acknowledged that he was angry at the Defendant and may have used obscenities toward the Defendant. Detective Hartley denied threatening the defendant.

Officer Tate testified that he did not threaten the Defendant and did not see anyone else threaten the Defendant. Officer Tate indicated while Defendant was completing his statement he was in the room but was not standing over Defendant's shoulder and did not tell him what to say.

At the supplemental suppression hearing, Defendant testified Detective Hartley told him he would not "lawyer up", pointed a finger at him and pounded his fist on the desk. Defendant testified once Detective Hartley left the room Officer Tate gave Defendant several choices for the motive for

the crime and instructed Defendant to mention photographing the child's genitalia in his statement.

The court notes that the "interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." *Id*. "[T]he fact that the tactics produced the intended result . . . does not make [a] confession involuntary. *United States v. Astello*, 241 F.3d 965, 968 (8th Cir. 2001) (internal quotation omitted), *cert. denied,* 533 U.S. 962 (2001). In other words, "there is nothing inherently wrong with efforts to create a favorable climate for confession." *United States v. LeBrun,* 306 F.3d 545, 555 (8th Cir.2002) (internal quotation omitted). " '[Q]uestioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.'" *Astello,* 241 F.3d at 967 (quoting *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir.1993)). Nor will a promise of leniency, an "expressed disbelief in the statements of a suspect . . ., or lie[s] to the accused about the evidence against him" necessarily render a confession involuntary. *Wilson v. Lawrence County,* 260 F.3d 946, 953 (8th Cir. 2001) (internal citations omitted). Rather, the coercive conduct must be "such that the defendant's will was overborne and his capacity for self-determination critically impaired." *Astello,* 241 F.3d at 967 (internal quotation omitted). In general, a statement by police that it would be better for the accused to tell the truth does not constitute an implied or express promise of leniency for the purpose of rendering his confession involuntary. *Bolder v. Armontrout,* 921 F.2d 1359, 1366 (8th Cir. 1990) (involving penalty of death); *see, e.g., U. S. v. Pierce,* 152 F.3d at 808, 813 (8th Cir. 1998) (statement that it would be to the suspect's benefit if he cooperated with them is not improperly coercive); *Bannister v. Armontrout,* 4 F.3d 1434, 1440 (8th Cir. 1993) (comments that it would be in the accused's best interest to cooperate did not render his statement involuntary in death penalty case). Further, an

12

officer "may indicate that the person's cooperation would be brought to the attention of the public officials or others involved, or may state in general terms that cooperation has been considered favorably by the courts in the past. What is prohibited, if a confession is to stand, is an assurance, express or implied, that it will aid the defense or result in a lesser sentence." *Commonwealth v. O'Brian*, 445 Mass. 720, 725 (Mass. 2006) (citing *Commonwealth v. Meehan*, 377 Mass. 552, 564 (1979), cert dismissed, 445 U. S. 39 (1980)).

The court again is faced with conflicting accounts of the conditions under which Defendant provided his statements. The court is also cognizant of the fact that during the suppression hearing in state court, Defendant did not take the stand and testify that the officers coerced his statements. Likewise, Ms. Nichols did not appear and testify for Defendant's suppression hearing in state court and did not file a complaint with the Alma police department.

The court, while not pleased that the detective would hurl obscenities at the defendant during an explanation of his rights, cannot say that the "harsh" attitude of Detective Hartley coerced the Defendant to make any statement. Detective Hartley was no longer even in the room when the Defendant made his statement to Officer Tate. Given the fact that the Defendant described Officer Tate as the "voice of reason," it is clear that any perceived threat was eliminated when Detective Hartley left the room. The court also does not find Defendant's testimony that Officer Tate told Defendant what to write in his statement credible. Officer Tate testified he did not tell Defendant what to say in his statement and the court finds Officer Tate's testimony to be credible.

Likewise, the court cannot say that the vague reference to how a jury may view a truthful defendant verses an untruthful defendant rises to the level of a promise. *U.S. v. Soto*, WL 3120816, 16 -17 (D.Minn.,2007)(not a promise when officer states that if a person is honest, he helps himself

by telling the truth).

The length of time the defendant is interrogated is also to be considered. In this instance the defendant was arrested around 5:00 p.m. (Tr. 40) He was transported to the Alma police department, a trip that took approximately 10 minutes, (Tr. 41) and he was advised of his Miranda Rights at 5:15 p.m. (Government's Exhibit 3) The Defendant's statement shows to be completed at 6:35 p.m. (Government's Exhibit 4)

Officer Tate also testified that no threats or coercion was used against the Defendant to get him to make the statement. (Tr. 58)

It is clear that Detective Hartley started the rights waiver form at 5:15 p.m. What is not clear is the amount of time that was devoted to the reading and waiver of the rights form. Officer Tate stated that it did take the Defendant some time to complete the statement because he was going very slowly. (Tr. 59-60) Detective Hartley testified that after he had advised the Defendant of his rights there was some delay at the point in the form where the Defendant waived his rights.

*Ashcraft v. Tennessee* involved an interrogation in which the suspect was questioned for 36 consecutive hours and denied sleep and rest. *Ashcraft v. Tennessee*, 322 U.S. 143, 153-154 (1944). This case involved one hour and twenty minutes with no indication that the Defendant was denied any food or rest. As such, we do not believe that the length of time of the interrogation to be particularly lengthy. *Simmons v. Bowersox,* 235 F.3d 1124, 1133 (8th Cir. 2001)(interrogation for approximately two hours was not considered to be particularly lengthy).

The interrogation took place at the police department but there was nothing intimidating about the room. The Supreme Court in *Reck v. Pate* found the confession was coerced where a 19 year-old youth of subnormal intelligence was questioned over four days and moved between jail

cells, interrogation rooms and hospital before he confessed and he was without adequate food, counsel, and the assistance of family or friends. *Reck v. Pate*, 367 U.S. 433, 441 (1961). Clearly, this case does not rise to that level.

Lastly, "[t]he government has the burden of proving by a preponderance of the evidence that, under the particular facts and circumstances of the case, the waiver was an intentional, voluntary, knowing, and intelligent relinquishment or abandonment of a know right or privilege." *United States v. Black Bear*, 422 F.3d 658, 663 (8th Cir.2005), citing *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir.2004)[en banc]*; U.S. v. Wells* 2007 WL 2990104, 3 (D.Minn.)(D.Minn.,2007). Our detailed review of the record fails to disclose coercive conduct, by the officers, that was sufficient to overbear the Defendant's will or to critically impair his capacity for self-determination. The court finds the Government has shown, by a preponderance of the evidence, under the particular facts and circumstances of this case, that the waiver of Mr. Nichols was intentional, voluntary, knowing and intelligent.

## C: Search Warrant

The last issue raised by the Defendant is that the search of the JPC Computer Tower, serial number 9510Y029JK, seized at the time the disks were seized was not lawful. The computer was not connected to the internet on the day the tower was seized (Tr. 24) but the Defendant did have internet access before he and Ms. Lamb moved to the home in Alma. (Tr. 25). When Ms. Lamb viewed the first unlabed cd it contained images of adult pornography that she believed was downloaded from the internet. (Tr. 15)

Officer Kevin Richmond prepared an affidavit (Government's Exhibit 6-7) which was used to obtain a search warrant (Government's Exhibit 8) which was signed by a Circuit Court Judge.

15

Officer Richmond stated that, in this particular case, it did not make any difference whether it was hooked up to the internet and that individuals that engage in child pornography used the computer like a filing cabinet. (Tr. 125) He did state that he had no idea if the computer was hooked to the internet or not at the time it was seized. (Tr. 126)

For a search warrant to be valid, it must be based upon a judicial finding that there is probable cause, that is, a "fair probability" to believe that the listed items may be found at the place to be searched. *Illinois v. Gates*, 462 U.S. 213, 232, 246, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Such a determination is to be based upon the "the totality of the circumstances." Id. at 238, 103 S.Ct. 2317. In other words, the task of the issuing magistrate is to make "a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id.; *U.S. v. Coleman,* 349 F.3d 1077, 1083 (8th Cir. 2003).

The affidavit is facially sufficient. A facially sufficient affidavit, however, may be challenged on the ground that it includes deliberate or reckless falsehood. *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The officer made no statement in the affidavit that was not true or was in any way misleading. He recited the facts that had been relayed to him by the investigating officers and he viewed the pictures that constituted child pornography. (Tr. 126) Accordingly, the court finds the seizure of the JPC Computer Tower and the resultant search appear to be valid.

**Conclusion:**

I recommend that the Motion to Suppress be denied for the reasons stated above. The parties

have **ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court**.

  IT IS SO ORDERED this 26th day of August 2008..


            /s/ *J. Marschewski*
            HONORABLE JAMES R. MARSCHEWSKI
            UNITED STATES MAGISTRATE JUDGE