IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

        v.        Criminal No. 08-20031-001

ANDREW PHILLIP NICHOLS                                      DEFENDANT

O R D E R

Now on this 12th day of September, 2008, comes on for
consideration defendant's **Motion To Suppress** (document #16); the
**Report And Recommendation** of Magistrate Judge James R. Marschewski
(document #61); and defendant's **Objections To Finding Of Fact By
The Magistrate Per 28 U.S.C. §636(b)(1)** ("Objections") (document
#63), and the Court, being well and sufficiently advised, finds
and orders as follows:

1.  Defendant is charged with eight counts of employing,
using, persuading, enticing and coercing a minor with the intent
that such minor engage in sexually explicit conduct as defined in
**18 U.S.C. §2256**, for the purpose of producing a visual depiction
of that minor using materials that have traveled in interstate
commerce, in violation of **18 U.S.C. §2251(a)** and **(e)**.

2.  Defendant moved to suppress the search of his home and
statements made by him subsequent to the search.  The matter was
referred to the Magistrate Judge for an evidentiary hearing, and
a Report And Recommendation has now been filed.  The government
does not object to the Report And Recommendation; the defendant

does object.

3.    In order to provide a factual background for discussion of defendant's Objections, the Court will set forth what it understands to be undisputed facts relating to the suppression issues.  On August 15, 2007, Alma police were contacted by a woman who claimed that she had found nude images of her young daughter - who was then seven or eight years of age - on defendant's computer.  Sgt. Brett Hartley and Officer Stephen Tate of the Alma Police Department went to defendant's home, where the woman showed them an image on a computer disk.  They seized two computer disks and a computer tower.

Later that day, Officer Tate arrested defendant on suspicion of possessing child pornography.  Defendant was given Miranda warnings by Sgt. Hartley in Officer Tate's presence, and signed a waiver of Miranda rights. He then wrote a statement about the matter.

4.    The Magistrate Judge reported that the search was justified by the consent of the defendant's live-in girlfriend, and that defendant wrote his statement after knowingly and voluntarily waiving his Miranda rights.

Defendant makes two objections to the Report And Recommendation.  He objects that his confession was coerced, and that the search of the computer disks was unconstitutional because the government did not obtain a search warrant to look at the

disks after they had been seized.

5.     Turning to the second objection first - because it is logical to do so - the Court finds no merit to the suggestion that a search warrant was required before authorities could review the computer disk[1] seized from defendant's home. Defendant's objection with regard to the search of the computer disk seems to be that since the government obtained a search warrant before searching the computer tower, it has conceded that it should have obtained a search warrant to view the disk.  The only case cited in connection with this issue is **Rakas v. Illinois**, **439 U.S. 128 (1978)**.  That case substituted "reasonable expectation of privacy" for "legitimately on the premises" as the litmus test for determining who has standing to challenge a search or seizure, and as such, is not particularly helpful to the issue here asserted.

The Court rejects the notion that the simple fact of obtaining a search warrant proves its legal necessity, and turns instead to the more relevant issue: was a search warrant required before authorities could view the disk seized in defendant's home? The Magistrate Judge found that the disk was properly seized during a search with consent, and defendant has not objected to this finding.  Both police officers testified that defendant's girlfriend put the disk in the computer and pulled up an image of

---

[1]Although defendant's objection is couched in terms of disks, plural, it appears that only one disk contained images related to his prosecution.  The Court has, therefore, focused only on that disk, and this Order does not purport to resolve any issues related to the other disk.

-3-

her naked child to show the officers before the disk was seized. Thus, the girlfriend consented not only to a seizure of the disk, but to its search.

As the Supreme Court explained in **Florida v. Jimeno**, **500 U.S. 248 (1991),**

> [t]he touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable. Thus, we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so. The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?
>
> The scope of a search is generally defined by its expressed object.

**500 U.S. at 250-51**(internal citations omitted).

The Court also finds relevant the case of **Illinois v. Andreas, 463 U.S. 765 (1983),** a case involving a second search of a shipping container that had already been searched a customs inspector. The Supreme Court there explained

> [t]he Fourth Amendment protects legitimate expectations of privacy rather than simply places. If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no "search" subject to the Warrant Clause. The threshold question, then, is whether an individual has a legitimate expectation of privacy in the contents of a previously lawfully searched container. It is obvious that the privacy interest in the contents of a container diminishes with respect to a container that law enforcement authorities have already lawfully opened and found to contain illicit drugs. No protected privacy interest remains in

-4-

contraband in a container once government officers lawfully have opened that container and identified its contents as illegal. The simple act of resealing the container to enable the police to make a controlled delivery does not operate to revive or restore the lawfully invaded privacy rights.

This conclusion is supported by the reasoning underlying the "plain view" doctrine. The plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity. The plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy. The rationale applies here; once a container has been found to a certainty to contain illicit drugs, the contraband becomes like objects physically within the plain view of the police, and the claim to privacy is lost. Consequently, the subsequent reopening of the container is not a "search" within the intendment of the Fourth Amendment.

**463 U.S. at 771** (internal citations omitted).

In this case, the expressed object of the search was the disk containing the image in question, and the police were expressly authorized to look at (i.e., search) that disk by the live-in girlfriend, who inserted the disk into the computer and pulled up the image for the express purpose of showing it to the officers. The Court finds this consensual search was reasonable.

Sgt. Hartley testified that the image shown to them was of the genital area of a young child. Once the officers had seen this image, they had probable cause to suspect that the disk was connected with criminal activity, and defendant had no legitimate

-5-

expectation of privacy in the contents of the disk. Its subsequent review was not a search "within the intendment of the Fourth Amendment."

For the foregoing reasons, the Court finds defendant's objection to the Report And Recommendation on the basis of the search of the disk to be without merit, and it will be overruled.

6. The contention by defendant that his confession was coerced presents a much closer question, hinging as it does entirely on a credibility issue. In its effort to resolve this issue, the Court has reviewed the transcript of a suppression hearing conducted in the Circuit Court of Crawford County, Arkansas[2], the transcript of the first evidentiary hearing conducted by the Magistrate Judge, and a "real time" draft[3] of the transcript of the second evidentiary hearing conducted by the Magistrate Judge. Those transcripts reveal that defendant's testimony about what happened when he was Mirandized and interrogated is diametrically opposed to that of Sgt. Hartley and Officer Tate.

(a) The scenario that emerged from the testimony of the officers was as follows:

_____

[2]This transcript was made an exhibit in the evidentiary hearing conducted by the Magistrate Judge.

[3]While this draft is not the final official transcript, being instead the uncorrected real-time draft produced by the court reporter's transcription equipment before the court reporter reconciles it with his back-up, it was nonetheless quite clear and readable, and the Court believes it has properly taken the intendment of the testimony contained therein.

* Defendant was arrested about 5:00 p.m. on August 15, 2007, by Officer Tate.

* Defendant was read his Miranda rights by Sgt. Hartley starting at 5:15 p.m., in the presence of Officer Tate.

* Officer Tate testified that he did not make any promises to defendant in order to persuade him to write the statement, nor did he threaten or bribe him or offer leniency or any other inducement. He also testified that no one else threatened defendant in his presence.

* Sgt. Hartley testified that he made no promises of leniency nor any threats to defendant, but that he did speak "harshly" to him at one point, that he "wasn't very friendly" or that he was "gruff," and that a person in defendant's position would think he was "being rough or mad at him." This occurred while Sgt. Hartley was reading the Waiver of Rights portion of the Miranda Rights Form to defendant. That portion of the form is as follows:

> I have read this statement of my rights and understand what my rights are. I am willing to make a statement and answer questions. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

When Sgt. Hartley reviewed this paragraph with defendant, defendant said "that's just it for me right now. I'm not really sure what's going on and I'm not sure what I'm doing." Sgt. Hartley told defendant he "was not very happy at that moment," and

-7-

explained that defendant was "here because of photographs were discovered. . . . you're down here now for an interview process." Sgt. Hartley admitted that he might have cursed at defendant, but testified that he did not hit the desk.  He testified that the situation irritated him because it was not something that a person with defendant's "level of education should have had a difficult time understanding."

        *    Sgt. Hartley testified that he went back over the situation with defendant and worked through it again, spending maybe five to ten minutes explaining what was going on, and that defendant then signed the Waiver of Rights form.  He testified that with defendant's level of education and his intelligence, "he could understand the difference between somebody that's probably not happy to be sitting there talking with him at the moment about this or somebody that's threatening force or pushing him into doing something." Sgt. Hartley also testified that at no time did defendant say he wanted to stop answering questions.  He also testified that he did not move his chair closer to the defendant's chair during the interview.

        *    Sgt. Hartley was not present while defendant wrote out his statement.  The statement was written in Officer Tate's presence. In it, defendant admitted taking photographs of a seven year old child's genitalia.  This statement was completed by 6:35 p.m. on the day of the arrest.

                                    -8-

(b)   Defendant testified to the following scenario:

*   When Officer Tate arrested him, he did so with his weapon drawn, telling defendant to "freeze."

*   He was taken to the police station, placed in a tiny, windowless, concrete room with both officers, and the reading of the Miranda warnings began.

*   When he came to the Miranda warning that he had the right to a lawyer, he stated that he needed and wanted an attorney.  Sgt. Hartley slammed his hand on the desk and told him he was not going to "lawyer up," that he would do what he was told.  Defendant described Sgt. Hartley as screaming, yelling, cursing, turning from Dr. Jekyll to Mr. Hyde when he asked for a lawyer.  He said he felt extremely intimidated, so much so that he did not use the words "lawyer" or "attorney" again.

*   After the Miranda warnings had been gone over, he was asked to sign a Waiver of Rights.  He objected that he was not going to waive his rights, but both officers assured him he was not waiving his rights, that this was "just a formality."  He signed the Waiver of Rights.

*   The officers then asked him to give a statement, saying they had evidence against him and telling him how things would look to a jury at trial.  They told him they had all night, that he wasn't going home, and that he was on his own.

*   Sgt. Hartley then left the room, leaving him alone with

Officer Tate, who seemed to him the more reasonable one.  He did not know what to write on the statement but Officer Tate told him what to say and he wrote it.  About halfway through that process, he told Officer Tate "this is not right, I'm not comfortable with this, I need help."  He did not use the word "lawyer" because he was afraid to, so he used the words "advisor" and "counselor." Officer Tate told him that when he had finished the statement he could call for help.

7.    The differences between these accounts of the arrest and interrogation of defendant are stark and irreconcilable.  Thus, the Court is placed in the position of having to make a judgment concerning the credibility of these particular witnesses in order to resolve the motion to suppress as it relates to defendant's confession.

The Court will commence its analysis of the issue by observing that it strongly doubts that any single account - by any single witness - is completely candid and truthful.[4] Based upon its review of the entire matter, the Court believes the police officers probably sanitized and tailored their recitations of the scenario to make it seem less coercive than it was; and  defendant probably embellished and exaggerated his account of the situation to make it seem more coercive than it was.  The truth, in the Court's view, lies somewhere in between.

---

[4]Defendant's mother also testified, but given that she was not present during any of the relevant events, the Court will not take her testimony into consideration.

-10-

In trying to determine the true facts, the Court is mindful that the government, being the proponent of the evidence, bears the burden of proof, and must carry it by a preponderance of the evidence. **Colorado v. Connelly, 479 U.S. 157, 168 (1986)**. The Court finds, with that burden in mind, that the true facts pertinent to the issue now under consideration most likely are as follows:

* Defendant *was* read his Miranda rights, and *did* understand them. Defendant does not deny this, and his age[5], education[6], and work history[7] make it extremely unlikely that he would be confused about the meaning of these important rights, which are couched in simple language.

* Defendant *did* read and understand the Waiver of Rights form, which is also couched in simple language. Although defendant denies that he did anything more than "skim" the Waiver of Rights, and asserts that he was told it was "just a formality," the Court does not find it credible that defendant would either fail to read what he was signing, or sign something he did not agree to. Defendant had worked for seven years in a job where he routinely went over written forms dealing with important matters with clients, and obtained their signatures, and he could not help

---

[5]Defendant was 34 years old at this time.

[6]Defendant had graduated high school, had taken some college course work, and had some specialized training in the field of insurance.

[7]Defendant had been selling insurance and financial products for seven years.

but know the significance of reading and signing important documents. Moreover, defendant's testimony that he recoiled at the thought of waiving his rights is evidence that he recognized the importance of signing the document.

\* Defendant *did* express his desire to have the assistance of counsel during the interrogation process. Although the police officers deny this, the Court finds defendant's testimony on this issue more credible. Defendant is an educated and intelligent person, who would have understood the peril he was in. His mother had worked as a legal secretary since he was a child, and it is unlikely that he could have grown up in her home without developing an understanding of the value of legal counsel to a person in trouble. The Miranda warnings informed defendant that he had the right to talk to a lawyer for advice before being questioned, that he could have a lawyer with him during questioning, and that a lawyer would be appointed at no cost to him if he could not afford to hire one.

According to Sgt. Hartley, defendant halted the waiver process with the statement that he did not understand what was going on, whereupon Sgt. Hartley went back over the situation and explained to defendant why he was there and what was happening. The Court is unable to credit that testimony, because if that were what occurred, Sgt. Hartley's admitted anger would be entirely out of proportion with the situation. There is no evidence that

defendant was belligerent or uncooperative with the police officers or had done anything to provoke them.  There is no evidence that there was any need to rush the interrogation process.  Going over the Miranda warnings, explaining things, and offering defendant an opportunity to waive his rights and make a statement were routine parts of Sgt. Hartley's job, and any difficulties he encountered in these areas would not justify the anger and irritation he admitted displaying.

The Court finds it more likely that Sgt. Hartley's burst of anger was related to defendant's request for a lawyer, which would have thwarted the police officers' goal of obtaining a confession.

The Court is aware that the Magistrate Judge came to the opposite conclusion with respect to this issue, but that conclusion relied almost entirely on the fact that three different hearings were conducted on the suppression issue, and it was only at the third that defendant testified about requesting counsel. The Court hesitates to consider this a sufficient basis for such an important credibility determination.  The record shows that, unlike the time when he was interrogated by the police and gave the statement in question, defendant was represented by counsel at all three of these hearings.  Defendant's decision not to testify in the first two hearings may well have been made on the advice of counsel, which might or might not have been good advice. The Court is not comfortable in concluding that a defendant's credibility is

-13-

impaired - when he does testify - by the fact that he may have decided not to testify previously on advice of counsel. Thus, the Court respectfully disagrees with the Magistrate Judge that this fact is dispositive of the issue.

The Court might well view the matter differently if the defendant had, in fact, testified in the first two hearings and not mentioned any request for counsel, but defendant did assert it in the only testimony he gave on the issue, and that testimony is consistent with the other facts upon which the Court relies with respect to this important credibility issue.

8.   The legal result to be reached on the suppression issue concerning defendant's confession flows naturally from the foregoing factual conclusions.  The interrogation process should have stopped immediately when defendant indicated his desire to be represented by an attorney, and no further interrogation should have been conducted until an attorney was provided unless defendant himself initiated it.  **<u>Edwards v. Arizona</u>, 451 U.S. 477 (1980).**  Had the interrogation process stopped, the confession would not have been written - at least not at the time and place and under the circumstances it was written.

For these reasons, the Court declines to accept the Report And Recommendation on the confession issue, and will grant the Motion To Suppress as it relates to that issue.

**IT IS THEREFORE ORDERED** that the **Report And Recommendation** of

-14-

Magistrate Judge James R. Marschewski (document #61) is **adopted in part and not adopted in part.**  The motion is adopted insofar as it treats of the search of defendant's home and the computer disk, and not adopted insofar as it treats of defendant's confession.

   **IT IS FURTHER ORDERED** that defendant's **Objections To Finding Of Fact By The Magistrate Per 28 U.S.C. §636(b)(1)** ("Objections") (document #63) are **sustained in part and overruled in part.**  The Objections are sustained insofar as they relate to defendant's confession, and overruled in all other respects.

   **IT IS FURTHER ORDERED** that, for the reasons set forth in the Report And Recommendation and in this Order, defendant's **Motion To Suppress** (document #16) is **granted in part and denied in part.** The Motion is granted insofar as it seeks to suppress defendant's written confession, and denied in all other respects.

   **IT IS SO ORDERED.**

                         **/s/ Jimm Larry Hendren**
                         **JIMM LARRY HENDREN**
                         **UNITED STATES DISTRICT JUDGE**